IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HELEN M. BUTLER,<br><br>    Plaintiff,<br><br>vs.<br><br>MICHAEL J. ASTRUE,<br>Commissioner of Social Security<br><br>    Defendant. | Case No.  1:09-cv-00402-JLT<br><br>ORDER REGARDING PLAINTIFF'S SOCIAL SECURITY COMPLAINT<br><br>ORDER DIRECTING REMAND PURSUANT TO SENTENCE FOUR OF 42 U.S.C. § 4-5(g)<br><br>ORDER DIRECTING ENTRY OF JUDGMENT IN FAVOR OF PLAINTIFF AND AGAINST DEFENDANT MICHAEL J. ASTRUE |

**BACKGROUND**

Plaintiff Helen M. Butler ("Plaintiff") seeks judicial review of an administrative decision denying her claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") benefits under Titles II and XVI of the Social Security Act (the "Act").

**FACTS AND PRIOR PROCEEDINGS**[1]

On February 28, 2006, Plaintiff filed an application for DIB and SSI benefits alleging that disability had prevented her from working since September 4, 2004.  See AR at 105-12.  After the agency denied benefits, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ")

---

[1] References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

1

(Id. at 14) which was held on August 20, 2008. Id. at 16-48. On November 21, 2008, the ALJ issued a decision denying benefits. Id. at 4-13. Specifically, the ALJ found that Plaintiff was not disabled within the meaning of the Act. Id. at 13. On January 30, 2009, the Appeals Council affirmed and it became the decision of the Commissioner. Id. at 1-3.

Hearing Testimony

At the hearing before the ALJ, Plaintiff testified that she lived in a home with her 29-year-old daughter. AR at 20. Plaintiff stated she was 56-years old, was five-foot six inches tall and weighed 264 pounds. Id. at 21-22. She stated she had no income and was dependant on her daughter for support. Id. at 20.

Plaintiff testified that she completed the eleventh grade but obtained her high school diploma at the age of 34. AR at 22. She reported that she had no special job training. Id. Plaintiff stated that her last job was as a deli manager at Grocery Outlet. AR at 23. Although she characterized this position as a "manager," she stated that she worked in this section by herself and did not supervise anyone. Id. at 24. She estimated that she worked in the job about two years. Id. at 23. She stated that she had worked at the Grocery Outlet for a total of 12 years, and had worked as a cashier and as a produce orderer prior to working as a deli manager. See id.

Plaintiff testified that her job as a deli manager required her to unload crates and boxes weighing as much as 50 pounds. AR at 24. She stated that in September 2004, she injured her back at work. Id. at 25. She described feeling a "popping and cracking in my back" followed by "shooting" pain. Id. She recounted that this pain went down her buttocks and leg. Id. at 25-26.

Plaintiff testified that as a result of this injury, she went to a doctor and underwent an MRI. AR at 26. Later, she was referred to an orthopaedic specialist and was treated with physical therapy. Id. Plaintiff recounted having as many as 11 epidural injections to ameliorate her pain. Id. She reported that the epidurals provided only temporary pain relief. Id. 38.

Plaintiff described pain in her back, legs, knees and feet. AR at 27. She characterized her "average" pain as a 6 on a scale of 1 to 10. Id. at 28. She stated that this pain got worse if she did too much, such as if she stood for too long. Id. at 27. When she "over does it," she reported that the pain rose to a 10, but improved if she sat down for about 15 minutes. Id. at 28-29.

Plaintiff testified that she had other physical problems. AR at 29. She stated that she fell in November 2001 and developed a clot. Id. at 30. As a result of this problem, she stated that she had her knee "dressed" and was prescribed Coumadin. Id. She said that in 2002, she developed "deep venous thrombosis" in her left leg. Id. at 29. She claimed that this condition still caused problems, primarily swelling, but stated that she had stopped taking "water pills" because the doctor believed she didn't need them. Id.

Plaintiff stated that a couple of years prior to the hearing she had shortness of breath and went to the emergency room. AR at 30. She described being put on a "breathing machine" but stated that she was now better. Id. Plaintiff admitted that she used to smoke but claimed that she quit in May 2005. Id. at 31.

Plaintiff testified that she used a cane that was prescribed to her by her doctor. AR at 31. She claimed this became necessary after she fell on three different occasions. Id. She stated that the cane helped her with balance. Id. Plaintiff described weakness in her hands and problems twisting jars open. AR at 33. She stated she saw a doctor for this but he recommended no treatment. Id. Plaintiff stated that she had trouble concentrating. AR at 37. She attributed her inability to concentrate to a lack of sleep. Id.

Plaintiff testified that she took several medications, including a muscle relaxer, medication for incontinence, and she took Celebrex and used Voltarin gel for pain and inflammation. AR at 39. She estimated that she suffered muscle spasms two-to-three times a week, and that her problems with incontinence required her to stay near a bathroom most of the time. Id. Plaintiff also stated that she had high blood pressure. Id. She reported that the only side effect from her medications was blurred vision. Id. at 39-40. She attributed this problem to the Celebrex. Id. at 39.

Plaintiff testified that on an average day she would wake up, shower, put on a pullover shirt, shorts and "house shoes." AR at 36. Afterward, she stated that she would eat meals and rest. She stated that she watched television and read, but could not do either for very long because she could not sit for very long. Id. at 37. She estimated that she could not read for more than 30 minutes at one time. Id.

Plaintiff testified that she had a driver's license but only drove when necessary, such as when

1   she had a doctor's appointment and her daughter was unavailable. AR at 35. She stated that when
2   she rode in a car her back, knee and leg pain was aggravated. Id. She testified that she went grocery
3   shopping but only if she needed just a few items. AR at 41. Otherwise she let her daughter do the
4   shopping. Id.

5      Plaintiff stated that her daughter did most of the cooking. AR at 36. She reported that her
6   daughter would cook and freeze meals and Plaintiff would warm them later. Id. She stated that her
7   daughter bought frozen meals for her also. Id.

8      Plaintiff estimated that she could stand for about 30 minutes at a time. AR at 31. She stated
9   that if she stood longer, her back, legs and feet became painful and her knees weakened. Id. at 32.
10  She estimated that she could sit about 30 minutes at one time before her back would ache. Id. She
11  felt that she could walk about 20 minutes at once before needing to sit down. Id. She stated that if
12  she walked any longer her feet, legs and back would hurt and her knees became "puffy." Id.
13  Plaintiff believed that she could lift about 5 to 10-pounds without aggravating her back. AR at 32.
14  She stated that she could no longer lift 50 pounds as she did at her old job. Id. at 33. She believed
15  that if she lifted more than 10 pounds she would injure her back. Id. Plaintiff testified that her most
16  comfortable position was sitting. AR at 33.

17     She stated that she had insomnia and could sleep soundly only for two to three hours each
18  night. Id. at 34. She described tossing and turning but stated that she took no sleeping aids. Id. She
19  stated that she would lie down during the day to rest and to try to get relief from her pain, but
20  sometimes she couldn't sleep. Id. at 34.

21     Plaintiff estimated that she could stand for about 30 minutes in an eight-hour day, walk 15-20
22  minutes in an eight-hour day, sit for only about one hour in an eight-hour day, and carry only five
23  pounds at once. AR at 41. As a result, Plaintiff did not believe that she could perform the job of
24  cashier. AR at 40. She didn't believe that she could sit long enough to do that job and stated that
25  even if she was allowed to get up at will, her pain and inability to concentrate would prevent her
26  from doing this work. Id.

27     Plaintiff's daughter, Shawna de la Cruz testified also. She stated that her mother had lived
28  with her since just before her injury in September 2004. AR at 42. Shawna testified that before the

1  injury, her mother could do everything, including cook, clean, work, and take care of herself.  AR at
2  43.  She stated that in the immediate aftermath of the injury, she was unable to do anything.  Id.  She
3  indicated that more recently, Plaintiff's status had "progressed back and forth."  Id.  She believed that
4  Plaintiff still "struggles" with the daily activities of living.  Id.

5  Shawna noted that Plaintiff had difficulty concentrating.  AR at 44.  She described how she
6  wanted Plaintiff to take over paying the bills, but believed that she didn't have the "mental capacity"
7  to perform this task.  Id.  Shawna testified that Plaintiff did not sleep very well.  AR at 44.  She
8  estimated that Plaintiff's trouble sleeping had been ongoing for the last 1to 1.5 years.  Id.

9  Shawna stated that Plaintiff only occasionally shopped for groceries.  AR at 44.  She believed
10  Plaintiff was capable of picking up lightweight items some as long as she was not required to bend
11  over or overextend herself.  Id.  Shawna stated that she cooked meals and then froze them for
12  Plaintiff to heat later.  Id. at 45.  She stated that she bought frozen dinners for Plaintiff also.  Id.

13  Shawna stated that the epidural injections have helped Plaintiff but described the relief as
14  temporary.  AR at 43.  She characterized the main benefit from the treatments as enabling Plaintiff to
15  stand for longer periods of time and permitting her to bathe and dress with less difficulty.  Id.

16  A vocational expert ("VE"), Linda Farrell, testified also.  She described Plaintiff's past work
17  as a cashier as light and unskilled and her position as a deli manager, which she described as a stock
18  clerk job, as semi-skilled and heavy.  AR at 46.

19  In the first hypothetical posed to the VE, the ALJ described a person of Plaintiff's age,
20  education and work experience.  AR at 46.  The ALJ described the person as having a "combination
21  of severe impairments" which restricted her to lifting and carrying 20 pounds occasionally and 10
22  pounds frequently; standing/walking/sitting for six hours each in and eight-hour day; and climbing,
23  kneeling, crouching and crawling occasionally.  Id.  The VE opined that such a person could perform
24  Plaintiff's past work as a cashier.  Id.

25  In a second hypothetical, the ALJ described a person with the same background and
26  combination of impairments, but restricted standing/walking/sitting to a maximum of one hour each
27  in an eight-hour day; lifting 5- to 10-pounds and carrying  5 pounds; concentrating in no more than
28  one hour increments; and needing to be close to a restroom.  AR at 47.  The VE opined that a person

with these restrictions could not perform work as a cashier or perform any other work.  Id.  The VE also stated that the skills involved in Plaintiff's past work as a deli manager were not transferrable to sedentary work.  Id.

### Relevant Medical Evidence

In the immediate aftermath of her injury in September 2004, Plaintiff was examined by Dr. Irene Sanchez.  Upon examination, Dr. Sanchez noted that Plaintiff could not stand erect and had a "slow" gait.  AR at 292.  She described Plaintiff as appearing like an 80-year-old woman.  Id.  She characterized x-rays of Plaintiff's lumbosacral spine as displaying an "abnormality" at L5-S1 that she believed indicated spondylolisthesis.  Id. at 292-93.  She diagnosed Plaintiff with lumbar radiculopathy, right low extremity, but ruled out a herniated disc.  Id. at 293.  Dr. Sanchez recommended an MRI, placed Plaintiff off work and prescribed Toradol, Demerol and Vicodin.  Id.

Later that month, an MRI was performed.  AR at 248.  Dr. William Dunn interpreted the findings as evidencing mild degenerative changes with no disc protrusion at T12-L1.  AR at 248.  He noted degenerative changes of the lumbar spine with a focal, moderately large protrusion and extruded component of the right side at L5-S1 compressing the S1 root and the ventral lateral aspect of the thecal sac.  Id. at 249.  He also noted a broad annular tear and protrusion at the L3-4 level lateralizing more to the left of midline and bulging into the neural foramen.  Id.

At a follow-up examination in October 2004, Dr. Sanchez discussed the MRI findings with Plaintiff.  AR at 288.  Dr. Sanchez noted that Plaintiff seemed to have somewhat less discomfort and stood more erect, although she still walked with a gait favoring the left leg.  Id.  She referred Plaintiff to Dr. Brian Grossman for a consultative examination.  Id. at 289.

Dr. Grossman saw Plaintiff on October 18, 2004.  Plaintiff complained to him of right hip pain and pain running down her right leg.  AR at 278.  Dr. Grossman reviewed the recent MRI and examined Plaintiff.  Id. at 279.  He noted a large right paracentral disc extrusion at L5-S1 resulting in "severe" right lateral recess and foraminal entry zone stenosis.  Id. at 279-80.  Dr. Grossman diagnosed Plaintiff with disc extrusion, right L5-S1 with radiculopathy.  Id. at 280.  He advised that Plaintiff could return to work, but restricted her to standing no more than 6 hours a day, with 10 minute breaks each hour, and also restricted her to lifting no more than 10 pounds.  Id.

At a follow-up examination with Dr. Grossman on November 1, 2004, Plaintiff reported that in the previous week or two, her significant right leg pain had improved but that she still had pain in the right buttocks. AR at 270-71. Dr. Grossman diagnosed a herniated lumbar disc at L5-S1 with radiculopathy. Id. at 271. In a follow-up examination a month later, Dr. Grossman reported that Plaintiff had received her first epidural treatment, which resulted in no more radiating pain but Dr. Grossman noted that some low back pain remained. AR at 262. He reiterated his previous diagnosis but expanded it to include degenerative discs at L1-2, L2-3, L3-4 and L4-5, with disc protrusion and annular tear at L1-2 and L3-4. Id. at 263. He restricted Plaintiff to lifting no more than 10 pounds and to no more than occasional bending, stooping and standing. Id.

Between January 2005 and November 2006, Plaintiff was treated by Dr. Russell Nelson. During this period, Dr. Nelson diagnosed Plaintiff with a herniated disc at L5-S1 with disc injuries above that point, as well as multilevel spondylosis. See AR at 373-74, 377-78, 380-81, 385-86, 389-90, 393-95, 398-99, 402-04, 406-08 and 411-15. Dr. Nelson documented Plaintiff as experiencing tenderness in the lumbar and paraspinous regions, with pain radiating down the legs and with intermittent periods of numbness and tingling in the feet and prescribed various pain medications. See id. He reported that an MRI showed "multiple areas of abnormality" in her spine. Id. at 386. Dr. Nelson noted that Plaintiff seemed to benefit from epidural treatments. Id. at 402.

Between March 2007 and May 2008, Plaintiff saw Dr. John Larsen who noted tenderness in her lumbar and paraspinal region and that she made frequent complaints of persistent back and leg pain. See AR at 559, 562-63, 566, 567, 569, 570-71, 575, 577, 579, 581-82, 585-86, 589-90. Dr. Larsen diagnosed degenerative disc disease and lumbar disc herniation at L5-S1 with spondylosis and stenosis. See id. A new MRI was performed in March 2007.[2] Id. at 590. Dr. Larsen reported that it showed a 4 mm disc protrusion at L4-S1. Id. at 582. He characterized Plaintiff as "temporarily totally disabled." Id. at 566, 567, 569, 571, 575, 579, 582, 586 and 590. He recommended that Plaintiff be given epidural treatments for her symptoms, as well as other possible

---

[2] Dr. Charles Taylor interpreted this MRI as evidencing a posterior disc protrusion at L5-S1, with a disc bulge at L2-3 and "severe" degenerative disc disease at L1-2, and noted "[c]onsiderable paramagnetic artifact from L1 above caused by a quarter moon shaped calcific density in soft tissues posterior to the T12-L1 level." AR at 481-82.

7

1  "invasive" treatment. Id. at 582, 586.

2  In July 2005, Plaintiff was examined by Dr. Stephen Choi, an orthopaedist. Plaintiff reported
3  to Dr. Choi that she had suffered "minor intermittent" back pain since January 2004. AR at 312.
4  Plaintiff reported also an onset of "sharp pain" while stocking cases of milk and juice at work on
5  September 4, 2004. Id.

6  Dr. Choi reviewed Plaintiff's September 2004 MRI and noted that it showed "diffuse
7  degenerative disk change in the lower lumbosacral spine." AR at 313. He noted that it revealed "a
8  large right paracentral bulging disk, either protruded or extruded, causing stenosis, and causing S1
9  impingement" in the L5-S1 region. Id.

10  Dr. Choi characterized Plaintiff's complaint as "mechanical pain." At the time, Plaintiff told
11  Dr. Choi that "with rest, there is no pain." AR at 313. She told him that with increased activity, her
12  pain rose in direct proportion. Id. Plaintiff reported that she could lift a maximum of 10 pounds, and
13  sit only for a couple of hours in an entire day. Id. She told him that standing became difficult after
14  about 30 to 45 minutes and that she could not walk for more than 10 minutes. Id. She denied
15  waking up at night with pain and also denied any numbness or tingling in her lower extremities. Id.

16  Dr. Choi described Plaintiff as walking with a "slow, steady gait." AR at 315. He saw no
17  limping or antalgic gait but noted some stiffness in her back and a loss of posterior lordosis. Id. He
18  did not believe she was in acute distress. Id. He described her back range of motion as
19  "compromised." Id.

20  Dr. Choi described Plaintiff's condition as a low back strain without radiculopathy. AR at
21  318. He also diagnosed "[p]robable diskogenic myofascial strain with obesity and deconditioned
22  low back." Id. at 319. Dr. Choi believed that Plaintiff aggravated a chronic, ongoing degenerative
23  disc condition in September 2004, and that this condition resulted from her obesity. See AR at 319.
24  He noted that when a patient has a "deconditioned back" and is overweight, recovery may be
25  "extremely difficult and compromised, unless the patient loses excess weight." Id. He believed that
26  the injury she sustained in September 2004 was "gradually resolving" but that because of her weight
27  and deconditioned back, "she still gets mechanical pain with activities." Id. He characterized her
28  condition as permanent and stationary and believed "she has reached maximal medical

1 improvement." Id.

2     Dr. Choi believed that Plaintiff should be precluded from lifting more than 25 pounds and avoid bending and twisting of the back for the next six months to a year while her deconditioned back was rehabilitated. AR at 320. He believed her chronic degenerative disc disease would not improve if she did not lose weight and also believed that she could not return to her past work as a deli manager due to the "extreme demands" placed on her lower back from that work. Id. at 321.

    In July 2006, Plaintiff was examined by Dr. Sarupinder Bhangoo. He noted her complaints of low back pain since September 2004. AR at 358. Plaintiff told him that she could drive and, in fact, drove to the examination. Id. at 359. She told him that she was able to take care of her personal needs and go to the store. Id. She stated that she worked in the garden "occasionally" but not on "bad days" when her back was "really hurting." Id. She denied experiencing any numbness or weakness in her extremities. Id.

    Dr. Bhangoo diagnosed Plaintiff with degenerative lumbar disc disease at L5-S1 and T4. AR at 361. He noted that her medical records indicated that she had a history of Chronic Obstructive Pulmonary Disease ("COPD"). Id. He documented that she was prescribed numerous medications, including several for pain and inflamation, including Naproxen and Hydrocodone, as well as aspirin. Id. at 359.

    Plaintiff reported that she believed that her main barrier to working was her back pain. AR at 362. She described her back pain as varying from 1 to 7 on a scale of 1 to 10. Dr. Bhangoo opined that this level of pain was "confirmed by evidence of herniation on an MRI done in 2004." Id. Nevertheless, Dr. Bhangoo found that Plaintiff did not have any limitations caused by her condition. AR at 362. He noted that the day of the examination must be one of her "good days" because she was able to bend and touch her toes, take off her shoes and socks and climb onto the exam table without any difficulty. Id. In light of the MRI report and his examination and observation of her, Dr. Bhangoo opined that Plaintiff could stand and/or walk for at least six hours in an eight-hour day, sit for eight hours in an eight-hour day, lift and carry 50 pounds occasionally and 25 pounds frequently and had only a postural limitation related to bending and stooping. Id. He found no manipulative limitations. Id. Dr. Bhangoo characterized Plaintiff's "maximal functional capacity" as "medium

9

1  with limitations of bending and stooping to an occasional basis." Id.

2      A physical RFC assessment was conducted by a non-examining agency consultant in August
3  2006. It concluded that Plaintiff had a primary diagnosis of degenerative disc disease with obesity
4  and "mild" COPD. AR at 367. The reviewer opined that Plaintiff could lift/carry 20 pounds
5  occasionally and 10 pounds frequently; stand/walk/sit for six hours each in an eight-hour workday;
6  push/pull without limitation; climb, balance, stoop and crawl frequently; and stoop and crouch
7  occasionally, with no manipulative, visual or communicative restrictions. Id. at 368-70.

8      A second RFC assessment was conducted by a different non-examining agency consultant in
9  March 2007. It documented virtually the same findings as the August 2006 assessment, except that
10 it restricted Plaintiff to only occasional climbing, stooping and crawling. See AR at 420-21.

11     In June 2008, Plaintiff visited Kern Medical Center. At the time, she reported that although
12 she had problems "ambulating," she had "no problems" with activities of daily living. AR at 592.

13     ALJ Findings

14     The ALJ evaluated Plaintiff pursuant to the customary five-step sequential evaluation. First,
15 the ALJ determined that Plaintiff had not engaged in substantial gainful activity since the date of her
16 alleged onset of disability on September 4, 2004. AR at 9. Second, he found that Plaintiff had a
17 severe impairment caused by degenerative disc disease of the lumbar spine. Id. Third, the ALJ
18 determined that no impairment, or combination of impairments, met or exceeded the level required
19 under agency guidelines for presumed disability. Id. at 13.

20     Fourth, the ALJ determined that Plaintiff had the RFC to lift and carry 20 pounds
21 occasionally and 10 pounds frequently, to sit, stand, and walk for six hours out of an eight-hour day,
22 and occasionally climb, kneel, crouch, and crawl. AR at 10. Based on this RFC finding and the
23 VE's testimony, the ALJ determined that Plaintiff retained the ability to perform her past relevant
24 work as a cashier. Id. at 12. As a result, the ALJ determined that Plaintiff was not disabled as
25 defined by the Act. Id. at 13.

26     **SCOPE OF REVIEW**

27     Congress has provided a limited scope of judicial review of the Commissioner's decision to
28 deny benefits under the Act. When reviewing the findings of fact, the Court must determine whether

the Commissioner's decision is supported by substantial evidence.  42 U.S.C. 405 (g).

Substantial evidence means "more than a mere scintilla," Richardson v. Perales, 402 U.S. 389, 402 (1971), but less than a preponderance. Sorenson v. Weinberger, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975).  It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson, 402 U.S. at 401.  The record as a whole must be considered, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion. Jones v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985).  The Court must uphold the determination that the claimant is not disabled if the Commissioner applied the proper legal standards and if the findings are supported by substantial evidence.  See Sanchez v. Sec'y of Health and Human Serv., 812 F.2d 509, 510 (9th Cir. 1987).

**REVIEW**

In order to qualify for benefits, a claimant must establish that she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than 12 months.  42 U.S.C. § 1382c (a)(3)(A).  A claimant must show that she has a physical or mental impairment of such severity that she is not only unable to do her previous work, but cannot, considering her age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. Quang Van Han v. Bowen, 882 F.2d 1453, 1456 (9th Cir. 1989).  The burden is on the claimant to establish disability. Terry v. Sullivan, 903 F.2d 1273, 1275 (9th Cir. 1990).

In an effort to achieve uniformity of decisions, the Commissioner has promulgated regulations which include the five-step sequential disability evaluation process described above.  20 C.F.R. §§ 404.1520 (a)-(f), 416.920 (a)-(f) (1994).[3]  As noted, applying this process in this case, the ALJ found that Plaintiff: (1) had not engaged in substantial gainful activity since September 4, 2004; (2) had a medically determinable severe impairment (degenerative disc disease of the lumbar spine); (3) did not have an impairment or combination of impairments which met or equaled one of the listed impairments set forth in Appendix 1, Subpart P, Regulations No. 4; and (4) was able to

---

[3] All references are to the 2000 version of the Code of Federal Regulations unless otherwise noted.

11

perform her past relevant work as a cashier. AR at 9-12. The ALJ then determined that Plaintiff was not under a "disability" as defined in the Act. Id. at 13.

Plaintiff challenges the ALJ's determination at Step 4 of the sequential evaluation process, where her ability to perform her past work was assessed based upon her RFC. In particular, Plaintiff challenges the ALJ's implicit rejection of her symptom testimony and her daughter's testimony. She asserts also that the ALJ's ignored the vocational evaluation report prepared by a state vocational counselor as part of Plaintiff's application for workers' compensation benefits. (See Doc. 18 at 8-17).

## DISCUSSION

1.  The ALJ failed to present germane reasons for discounting lay testimony from Plaintiff's daughter

At the hearing, Shawna testified that Plaintiff was unable to do anything in the immediate aftermath of her September 2004 injury. AR at 43. She described Plaintiff's progress since then as "back and forth" but acknowledged that epidural treatments provided relief and permitted her to bathe and dress with less difficulty and allowed her to stand on her feet for longer periods of time. Id. Shawna testified that Plaintiff occasionally went grocery shopping and could pick up items if she didn't have to bend or overextend herself. Id. at 44. Shawna stated that since her injury, Plaintiff had difficulty concentrating and lacked the "mental capacity" to perform tasks like paying bills. Id.

In Stout v. Commissioner, 454 F.3d 1050, 1053 (9th Cir. 2006), the Court held that,

> In determining whether a claimant is disabled, an ALJ must consider lay witness testimony concerning a claimant's ability to work. See Dodrill v. Shalala, 12 F.3d 915, 919 (9th Cir. 1993); 20 C.F.R. §§ 404.1513(d)(4) & (e), 416.913(d)(4) & (e). Indeed, "lay testimony as to a claimant's symptoms or how an impairment affects ability to work is competent evidence . . . and therefore cannot be disregarded without comment." Nguyen v. Chater, 100 F.3d 1462, 1467 (9th Cir. 1996) (citations omitted). Consequently, "[i]f the ALJ wishes to discount the testimony of lay witnesses, he must give reasons that are germane to each witness." Dodrill, 12 F.3d at 919; see also Lewis v. Apfel, 236 F.3d 503, 511 ("Lay testimony as to a claimant's symptoms is competent evidence that an ALJ must take into account, unless he or she expressly determines to disregard such testimony and gives reasons germane to each witness for doing so." (citation omitted)).

Although the ALJ acknowledged Shawna's testimony (AR at 12), seemingly, he did not consider it when he evaluated Plaintiff's ability to concentrate or perform tasks, such as paying bills.

12

See id. at 44. By declining to adopt a restriction on her ability to concentrate in his RFC assessment, he effectively rejected this aspect of Shawna's testimony. In fact, the Commissioner concedes that the ALJ "implicitly rejected Shawna's testimony that was inconsistent with the record of Plaintiff's activities and the medical evidence." (Doc. 19 at 12).

In Nguyen, 100 F.3d at 1467, the Court stated,

> The ALJ included neither claimant nor his wife's descriptions of his serious coughing problems in the hypothetical to the vocational expert, nor did he expressly state that he would discount their testimony or give any reasons therefore. *By failing to include in the hypothetical the physical manifestations that were described by the witnesses or expressly rejecting the testimony for legitimate reasons, the ALJ erred.* Lay testimony as to a claimant's symptoms is competent evidence which the Secretary must take into account, unless he expressly determines to disregard such testimony, in which case "he must give reasons that are germane to each witness." The government contends, relying on Vincent v. Heckler, 739 F.2d 1393, 1395 (9th Cir. 1984), that it was not error for the ALJ to disregard lay testimony without giving specific reasons for doings so. . . . The reliance on Vincent is misplaced. In that case, lay witnesses were making medical diagnoses, e.g., that the claimant had a serious mental impairment as a result of a stroke. Such medical diagnoses are beyond the competence of lay witnesses and therefore do not constitute competent evidence. However, *lay witness testimony as to a claimant's symptoms or how an impairment affects ability to work is competent evidence, and therefore cannot be disregarded without comment.*
>
> *Because the ALJ did not set forth reasons as to why he chose to discount the coughing testimony, . . . the ALJ's conclusion that claimant can do his previous work . . . is not supported by substantial evidence.*

(Citations omitted) (emphasis added). In light of this authority, the ALJ's failure to analyze whether Shawna's testimony was consistent with his RFC finding and his conclusion that Plaintiff retained the ability to work as a cashier was error. Moreover, when an alternative hypothetical was presented to the VE that included a restriction limiting a person with Plaintiff's profile to concentrating in no more than one-hour increments, that was based in part on Shawna's testimony, the VE concluded that such a person could not work as a cashier or perform any other work. Id. at 47; see Stout, 454 F.3d at 1056 ("where the ALJ's error lies in a failure to properly discuss competent lay testimony favorable to the claimant, a reviewing court cannot consider the error harmless unless it can confidently conclude that no reasonable ALJ, when fully crediting the testimony, could have reached a different disability determination"). Thus, the Court does not find that this error was harmless.

The Commissioner argues that because Shawna's statements concerning Plaintiff's problems were similar to Plaintiff's own testimony, and because he provided clear and convincing reasons for

13

discounting Plaintiff's symptom testimony[4], the ALJ likewise provided sufficient reasons for rejecting Shawna's testimony as well. (Doc. 18 at 13). In support the Commissioner relies upon Valentine v. Commissioner of Social Security Administration, 574 F.3d 685 (9th Cir. 2009).

However, the facts here are distinguishable from Valentine. In Valentine, unlike this case, the ALJ expressly rejected the testimony of the lay witnesses and expressly stated he was doing so for the same reasons he rejected similar testimony from the claimant. Id. at 694. The court held that where the ALJ gave "specific, clear, and convincing reasons for not fully crediting [the claimant's] testimony," he likewise provided germane reasons for not fully crediting similar testimony from lay witnesses. Id. at 694.

Here, the ALJ failed to address, let alone expressly reject, Shawna's testimony concerning Plaintiff's difficulty concentrating and performing clerical tasks due to her impairments. This complete failure warrants remand for the reasons mentioned in Nguyen. See Lewis v. Apfel, 236 F.3d 503, 511 (9th Cir. 2001) (holding that once an ALJ *expressly* rejects testimony from a lay witness that decision may be upheld as long as germane reasons exist in the record and were discussed by the ALJ, even if not directly linked to the lay witness testimony); see also Connett v. Barnhart, 340 F.3d 871, 874 (9th Cir. 2003) (holding that the mere presence of evidence in the record that would support an ALJ's conclusions, in the absence of the ALJ"s discussion thereof, was insufficient).

2. The ALJ's failure to discuss the conclusions of a state vocational expert's report which conflicted with his RFC finding was error

In May 2006, Susan Vaughan, a certified vocational counselor, filed a "Vocational Evaluation Report" with the California Department of Rehabilitation as part of Plaintiff's workers' compensation case. See AR at 322-33. The report was based on a five-day evaluation of Plaintiff performed from May 1-5, 2006. See id. In her report, Vaughan evaluated Plaintiff's impairments and noted a diagnosis of a "herniated lumbar disc at L5-S1, with multi-level spondylosis." Id. at

---

[4] The Court notes that the ALJ listed Plaintiff's various reports to her health care providers about her abilities and listed the observations of her doctors and of Shawn de la Cruz. However, the ALJ failed analyze or explain why this evidence meant that Plaintiff "was not entirely credible."AR at 11.

1  323. The report characterized Plaintiff as able to follow instructions, interact with peers, accept
2  supervision, work independently, perform tasks requiring memory, persevere in performing physical
3  tasks while sitting, and express herself. Id. at 324. The report determined she could not perform
4  physical tasks while standing. Id.
5        Vaughan concluded that Plaintiff's impairments did not prevent her from performing
6  "sedentary employment." AR at 331-32. In particular, Vaughan wrote that Plaintiff could work "in
7  sedentary positions" which did not require her to sit for more than 45 to 60 minutes at a time. Id. at
8  331. Based on this conclusion, Vaughan determined that Plaintiff could perform the job of cashier
9  with accommodations for sitting for no more than 45 to 60 minutes at a time and with an option to
10 alternate between sitting and standing. Id. at 332, 333.
11       Despite the extensive testing and analysis provided by Vaughan in her report, in his decision
12 here, the ALJ noted only,

> In May 2006, the claimant underwent a vocational evaluation by Susan Vaughan, a Certified Vocational Counselor. The claimant had difficulty concentrating as her pain increased. Ms. Vaughan determined the claimant could perform sedentary positions with no sitting more than 45 to 60 minutes, e.g. cashier, light stock clerk, and dispatcher.

16 AR at 10 (citations omitted). The ALJ's decision makes no further mention of the report. This was
17 error.
18       In Flores v. Shalala, 49 F.3d 562, 569-70 (9th Cir. 1995), a vocational report filed by the
19 Testing, Evaluation and Management Work Evaluation Center ("TEAM Report") concluded, after 10
20 days of testing and interviewing, that Flores functioned at a "'fifth grade math level'" and "does not
21 appear able to return to work.'" Flores at 564. The ALJ denied benefits but failed to include the
22 restrictions outlined in the TEAM report in the hypothetical posed to the VE or to address the TEAM
23 report in his decision. Id. at 565. The Court held that the ALJ had an obligation to consider the
24 report and could not reject "'significantly probative evidence' without explanation." Id. at 570-71
25 (citing Vincent v. Heckler, 739 F.2d 1393, 1395 (9th Cir. 1984)). As a result, the court determined
26 that the ALJ erred in failing to present the restrictions in the TEAM report to the VE or "state
27 reasons for disregarding evidence of that nature" in his written decision. Id. at 571.
28       Here, by failing to incorporate the restriction outlined by Vaughan into his RFC or to pose

such a restriction to the VE in the hypothetical upon which he relied in making his RFC finding, the ALJ appears to have rejected the need for such a limitation. However, he failed to provide any basis for rejecting, the "accommodative modification" in Vaughan's report and failed to address the impact such a restriction would have on her ability to perform her past work as a cashier. This was error that warrants remand.

### 3. It is premature to evaluate the ALJ's decision to discount Plaintiff's symptom testimony

Plaintiff contends that the ALJ improperly determined that her symptom testimony was not credible. (Doc. 18 at 8-12). On remand, the ALJ's determination as to the third-party evidence may impact his ultimate conclusion with respect to the credibility of Plaintiff's own symptom testimony. Therefore, addressing this issue at this time is premature.

### 4. Remand is appropriate

The decision whether to remand a matter pursuant to sentence four of 42 U.S.C. § 405(g) or to order immediate payment of benefits is within the discretion of the district court. Harman v. Apfel, 211 F.3d 1172, 1178 (9th Cir. 2000). When a court reverses an administrative agency determination, the proper course, except in rare instances, is to remand to the agency for additional investigation or explanation. Moisa v. Barnhart, 367 F.3d 882, 886 (9th Cir. 2004) (citing INS v. Ventura, 537 U.S. 12, 16 (2002)). Generally, an award of benefits is directed where no useful purpose would be served by further administrative proceedings, or where the record has been fully developed. Varney v. Secretary of Health and Human Services, 859 F.2d 1396, 1399 (9th Cir. 1988).

Because additional issues remain to be addressed upon remand and because it is not clear that an award of benefits to Plaintiff should result after the additional issues are addressed, the Court will order the matter remanded. McAllister v. Sullivan, 888 F.2d 599, 603 (9th Cir. 1989) (the decision to remand for further proceedings or simply to award benefits is within the discretion of the court).

///
///
///
///

**CONCLUSION**

Based on the foregoing, this case is HEREBY REMANDED to the Secretary for further proceedings consistent with this decision. The Clerk of Court IS DIRECTED to enter judgment in favor of Plaintiff.

IT IS SO ORDERED.

Dated:   **July 16, 2010**　　　　　　　　　　　　　　　　　　／s/ **Jennifer L. Thurston**
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　UNITED STATES MAGISTRATE JUDGE